UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANELLE GRATES, as Personal
Representative of the Estate of
TYLER VENEMA, deceased                    File No: 21-cv-

        Plaintiff,                        Hon.

-v-

FRED WEST, CURTIS KEYS,
and JODI DeANGELO,

        Defendants.

_____

## **<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiff, Janelle Grates, as Personal Representative of the Estate of

Tyler Venema, deceased, through her attorneys, Giroux Trial Attorneys,

PC, for her Complaint against the above-named Defendants states as

follows:

## **<u>JURISDICTION AND VENUE</u>**

1.      This is a civil action for money damages brought pursuant to 42

U.S.C. §§ 1983 and 1988, and the Eighth and Fourteenth Amendments to

the United States Constitution against Defendants, Fred West, Curtis Keys,

and Jodi DeAngelo, in their individual capacities.

2.      This court has jurisdiction over Plaintiff's claims presented in

this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343.

3.    Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b). The unlawful actions alleged in this Complaint took place at the Woodland Correctional Facility located in Whitmore Lake, Livingston County, Michigan, which is located within the Southern Division of the Eastern District of Michigan.

4.    The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest, costs and attorney fees.

## PARTIES

5.    Plaintiff, Janelle Grates, is the Personal Representative of the Estate of Tyler Venema, deceased, who, at all relevant times, was a citizen of the United States and in the care and custody of Michigan Department of Corrections, in the County of Livingston, State of Michigan.

6.    Defendant, Fred West, at all relevant times, was employed by the Michigan Department of Corrections (hereinafter "MDOC"), was acting in his individual capacity within the course and scope of his employment as a corrections officer at the Woodland Correctional Facility and was acting under color of law.

7.    Defendant, Curtis Keys, at all relevant times, was employed by

- 2 -

the MDOC, was acting in his individual capacity within the course and scope of his employment as a corrections officer at the Woodland Correctional Facility and was acting under color of law.

8.     Defendant, Jodi DeAngelo, at all relevant times, was and is the Warden of the Woodland Correctional Facility and she is named in this action in her individual capacity. At all times relevant, Defendant DeAngelo was responsible by statute and the United States Constitution for the supervision and oversight of the corrections officers at the Woodland Correctional Facility. As the Warden of Woodland Correctional Facility, Defendant DeAngelo is responsible for the administration of custodial, treatment, education, personnel, and business programs necessary for the operation of the Woodland Correctional Facility.

9.     As the Warden of Woodland Correctional Facility, Defendant DeAngelo determines operating policies and implementation methods, ensures completion of mandatory training for all staff, ensures adherence to departmental policies and procedures, writes and/or approves the writing and implementation of policies and procedures within the correctional facility, disciplines employees, and ensures conformance with general guidelines, methods, techniques, policies, and laws.

10.     At all times relevant, Defendant DeAngelo was directly

responsible for the creation, implementation, enforcing the customs, policies and practices as well as the recruitment, supervision, and discipline of the Corrections Officers in the Woodland Correctional Facility, including, but not limited to Defendants West and Keys.

## **FACTUAL ALLEGATIONS**

11.    Plaintiff's Decedent, Tyler Venema, was incarcerated with the Michigan Department of Corrections from October 20, 2014 until the date of his death on June 27, 2017.

12.    During the thirty-two (32) months of Tyler's incarceration, he was suicidal, unable to appreciate his medical needs, displayed obvious signs of severe mental illness, had difficulty sleeping, and banged his head on the walls repeatedly with an intent to harm himself.

13.    It was documented repeatedly in the Department of Corrections' records that, during one of Tyler's suicide attempts, he placed a bag over his head.

14.    In another suicide attempt during his incarceration, Tyler was found hanging in his cell with a flat bed sheet tied to the window sill/bar.

15.    During the thirty-two (32) months of Tyler's incarceration, he was placed on close observation for suicide on numerous occassions.

16.    The medical personnel at the Department of Corrections

diagnosed Tyler with disorganized schizophrenic disorder, polysubstance dependence, schizoid personality disorder, and borderline intellectual functioning.

17.    During the thirty-two (32) months of Tyler's incarceration, Tyler was subject to numerous involuntary treatment orders due to his significant mental illnesses.

18.    At the time of his death, Tyler was subject to a 90-day involuntary treatment order with an expiration date of July 7, 2017.

19.    On June 20, 2017, Tyler was transferred from the Residential Treatment Program (RTP) at Gus Harrison Correctional Facility to the inpatient Rehabilitative Services (RTS) at Woodland Center Correctional Facility due to his mental decompensation.

20.    On June 20, 2017 a Mental Health Management Plan was completed, wherein Tyler was assessed as a moderate risk of suicide, placed on close observation with 15 minutes cell checks. The correctional staff was instructed that Tyler be placed in a suicide prevention gown and he was to be prohibited all personal property, blues, bedding, bedroll, writing implements, groups, activities, yard, gym, treatment mall, and chow hall.

21.    On June 23, 2017, another Mental Health Management Plan

was completed, wherein Tyler was assessed as an intermediate risk of suicide or self-injury.

22.   The Mental Health Management Plan directed the Housing Unit Staff to observe and report the following behaviors:

**IV. BEHAVIORS TO OBSERVE AND REPORT:**  Refusal of medication, food or fluids
Self-harm, attempts at self-harm or verbalized threats of self-harm
Inability to follow unit rules/guidelines or staff commands; Lack of cooperation with staff
Any aggressive, profane, or destructive behaviors; Sudden changes in mood, behavior, or level of agitation
Direct or indirect comments about dying

23.   The Mental Health Management Plan directed the following interventions for the Housing Unit Staff:

**V. STAFF INTERVENTIONS:**  Notify MH of any further self-harm or threats of self-harm
Remain in close proximity, intervene immediately should prisoner engage in self-injurious behavior
Search prisoner and surrounding area for dangerous contraband during every shift
Utilize therapeutic communication and de-escalation techniques when engaging prisoner
Report the aforementioned behaviors to the Treatment Team

24.   Thereafter, Defendants West and Keys gave Tyler a plastic bag that contained his personal property, Blues, bedding, and bedroll.

25.   At all times relevant, the plastic bag was a known potential tool for suicide for Tyler, or any other inmate at risk of suicide or self-harm, and considered dangerous contraband.

26.   Neither Defendant West nor Defendant Keys retrieved the plastic bag from Tyler after he removed his belongings from it.

27.   On June 23, 2017, Defendant West observed Tyler

- 6 -

unresponsive in his cell with a plastic bag over his head.

28.    Tyler had no pulse and he was not breathing.

29.    Tyler was transported to the University of Michigan Hospital, where he was placed on life support.

30.    Tyler died on June 27, 2017.

31.    An autopsy was completed by Jeffrey Jentzen, M.D., Ph.D., who opined that the cause of death was asphyxia due to suffocation with a plastic bag and the manner of death was suicide.

**COUNT I**
**42 U.S.C. § 1983 - DELIBERATE INDIFFERENCE**
**DEFENDANTS WEST AND KEYS**

32.    Plaintiff restates and realleges the allegations contained in the preceding paragraphs as though fully set forth herein.

33.    As a citizen of the United States and an incarcerated inmate within the Michigan Department of Corrections, Tyler Venema was entitled to all rights, privileges, and immunities accorded to all incarcerated citizens of the State of Michigan and of the United States.

34.    Pursuant to the Eighth Amendment of the United States Constitution, at all times relevant,  Tyler Venema had a clearly established right to be free from cruel and unusual punishment while under the custody and control of Defendants.

- 7 -

35.    At all times relevant, Tyler Venema had a clearly established right to be protected from serious risks of harm and to adequate and sufficient medical care and/or treatment such that his life would be preserved and he would be free from needless unjustified and preventable pain, suffering, and deterioration of his health and well-being.

36.    At all times relevant, as corrections officers acting under color of law, Defendants West and Keys were required to obey the laws of the United States, including those laws identified under the Eighth Amendment to the United States Constitution.

37.    At all times relevant, Defendants West and Keys were the corrections officers assigned to the unit that Tyler was housed at the Woodland Correctional Facility.

38.    During the time period that Defendants West and Keys were on duty at the prison on June 23, 2017, they were charged with the responsibility of overseeing the health, safety, and well-being of the confined inmates, including but not limited to, Tyler Venema.

39.    At all times relevant, Defendants West and Keys knew that Tyler was at risk of suicide or self-injury, as assessed by a qualified mental health professional and reported to the corrections officers.

40.    It is well-established that suicidal tendencies are considered

serious medical needs.

41.    At all times relevant, the plastic bag was a known potential tool for suicide for Tyler, or any other inmate at risk of suicide or self-harm, and considered dangerous contraband.

42.    At all times relevant, Defendants West and Keys ignored and/or disregarded the substantial risk of serious harm to Tyler's health and safety when they provided Tyler with the plastic bag and callously refrained from removing the dangerous contraband from his cell, despite the explicit instructions and clear opportunity to do so.

43.    At all times relevant, while Tyler had a plastic bag over his head in his cell, he exhibited readily observable signs and symptoms of a serious medical need and continued to deteriorate physically, Defendants West and Keys delayed in obtaining the necessary help and/or treatment for Tyler's obvious need for a doctor's attention, although they had an opportunity to do so.

44.    If Tyler had received timely medical intervention for his readily observable signs and symptoms that obviously required a doctor's attention, more likely than not, he would have survived.

45.    The actions and the omission of acts by Defendants West and Keys demonstrated a reckless disregard to Tyler's serious risk of harm, as

well as his serious medical needs that posed an obvious risk of substantial harm, and deprived Tyler of his clearly established constitutionally protected rights under the Eighth Amendment to the Constitution of the United States including, but not limited to:

a.  Deliberately ignoring and/or disregarding the substantial risk to Tyler's health and safety and providing Tyler with a plastic bag, which was a known potential tool for suicide for Tyler, or any other inmate at risk of suicide or self-harm, and considered dangerous contraband;

b.  Callously refraining from removing the dangerous contraband from Tyler's cell, despite the explicit instructions and clear opportunity to do so.

c.  Failure to obtain timely medical attention when Tyler placed a plastic bag over his head;

d.  Failure to intervene when Tyler engaged in readily observable suicidal preparatory actions;

e.  Failure to provide close monitoring and supervision for Tyler as his physical condition obviously decompensated;

f.  Failure to provide timely hospitalization for Tyler; and,

g.  Any and all other breaches as they become known throughout the course of this litigation.

46.  The conduct of Defendants West and Keys, as described above, deprived Tyler Venema of his clearly established rights, privileges

and immunities in violation of the Eighth Amendment to the Constitution of the United States.

47.    As a direct and proximate result of the actions and/or omissions of Defendants West and Keys, Tyler Venema suffered great physical pain, discomfort, loss of mental capacity, humiliation, degradation, anguish, and, ultimately, died.

48.    As a direct and proximate result of the acts and/or omissions of Defendants West and Keys, the Estate of Tyler Venema, Deceased, has sustained and is entitled to compensation for conscious pain and suffering of the Deceased, funeral, burial, and economic costs and/or damages, loss of support, loss of gifts and gratuities and loss of love, society and companionship.

49.    The conduct of Defendants West and Keys was and remains extreme and outrageous subjecting Defendants to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

     a.    Reasonable medical, hospital, funeral and burial expenses;

     b.    Conscious pain and suffering;

     c.    Loss of financial support;

     d.    Loss of service;

e.      Loss of gifts or other valuable gratuities;

f.      Loss of comfort, society and companionship;

g.      Compensatory and punitive damages;

h.      Reasonable attorney fees, costs and interest; and

i.      Such other and further relief as appears reasonable and just under the circumstances and otherwise recoverable under 42 U.S.C. § 1983 and 1988.

**COUNT II**
**42 U.S.C. § 1983 - FAILURE TO TRAIN AND FAILURE TO SUPERVISE DEFENDANT DeANGELO**

50.    Plaintiff restates and realleges the allegations contained in the preceding paragraphs as though fully set forth herein.

51.    At all times relevant, Defendant DeAngelo knew that plastic bags were potential tools for suicide for inmates at risk of suicide or self-harm and considered dangerous contraband, knew that the corrections officers at the Woodland Correctional Facility were providing plastic bags to inmates at risk of suicide or self-harm, and knew that the corrections officers at the Woodland Correctional Facility were callously refraining from removing the plastic bags from the cells of inmates at risk of suicide or self-harm, all of which violated the inmates' clearly established constitutionally protected rights to be free from serious risks of harm.

- 12 -

52.     Defendant DeAngelo implicitly authorized, approved, and/or knowingly acquiesced in the corrections officers providing plastic bags to inmates at risk of suicide or self-harm.

53.     Defendant DeAngelo implicitly authorized, approved, and/or knowingly acquiesced in the corrections officers refraining from removing the plastic bags from the cells of inmates at risk of suicide or self-harm.

54.     Defendant DeAngelo's implicit authorization, approval, and/or knowing acquiescence in the corrections officers' actions with regard to the plastic bags allowed the corrections officers to continue to engage in the unconstitutional behavior.

55.     Defendant DeAngelo failed to ensure that the corrections officers were trained to not provide plastic bags to inmates at risk of suicide or self-harm.

56.     Defendant DeAngelo failed to ensure that the corrections officers were trained to remove plastic bags from the cells of inmates at risk of suicide or self-harm.

57.     Defendant DeAngelo failed to ensure that the corrections officers were properly supervised so that they would not plastic bags to inmates at risk of suicide or self-harm.

- 13 -

58.     Defendant DeAngelo failed to ensure that the corrections officers were properly supervised so that they would remove plastic bags from the cells of inmates at risk of suicide or self-harm.

59.     The risk of harm of providing a plastic bag to an inmate at risk of suicide or self-harm, and allowing that inmate to retain that plastic bag in his or her cell, is obvious.

60.     The lack of training and supervision of the corrections officers at the Woodland Correctional Facility with regard to providing plastic bags to inmates at risk of suicide or self-harm and allowing those inmates to retain the plastic bags in their cells was so reckless that future violations of the inmates' rights to be free from serious risks of harm were inevitable or substantially certain to result.

61.     At all times relevant, Defendant DeAngelo was on notice that the training and/or supervision of the corrections officers at the Woodland Correctional Facility with regard to the inmates' rights to be free from serious risks of harm was deficient and likely to cause injury, as described in the preceding paragraphs.

62.     Defendant DeAngelo's response to this knowledge was so inadequate as to show a complete disregard for whether the corrections

- 14 -

officers would violate the inmates' rights to be free from serious risks of harm.

63.   Defendant DeAngelo implicitly authorized, approved, or knowingly acquiesced in the inferior and substandard treatment of inmates who were at serious risk of harm and/or had serious medical needs and knew that such treatment would deprive an inmate of a constitutional right.

64.   As a direct and proximate result of Defendant DeAngelo's inadequate training and supervision of the corrections officers at the Woodland Correctional Facility and her implicit authorization, approval, and/or knowing acquiescence in the inferior and substandard treatment of inmates who were at serious risk of harm and/or had serious medical needs, Defendants West and Keys demonstrated a reckless disregard to Tyler's serious risk of harm, as well as his serious medical needs that posed an obvious risk of substantial harm, and deprived Tyler of his clearly established constitutionally protected rights under the Eighth Amendment to the Constitution of the United States, including, but not limited to:

> a.   Deliberately ignoring and/or disregarding the substantial risk to Tyler's health and safety and providing Tyler with a plastic bag, which was a known potential tool for suicide for Tyler, or any other inmate at risk of suicide or self-harm, and

considered dangerous contraband;

b.     Callously refraining from removing the dangerous contraband from Tyler's cell, despite the explicit instructions and clear opportunity to do so.

c.     Failure to obtain timely medical attention when Tyler placed a plastic bag over his head;

d.     Failure to intervene when Tyler engaged in readily observable suicidal preparatory actions;

e.     Failure to provide close monitoring and supervision for Tyler as his physical condition obviously decompensated;

f.     Failure to provide timely hospitalization for Tyler; and,

g.     Any and all other breaches as they become known throughout the course of this litigation.

65.     As a direct and proximate result of Defendant DeAngelo's inadequate training and supervision of the corrections officers at the Woodland Correctional Facility and her implicit authorization, approval, and/or knowing acquiescence in the inferior and substandard treatment of inmates who were at serious risk of harm and/or had serious medical needs, Tyler suffered great physical pain, discomfort, loss of mental capacity, humiliation, degradation, anguish, and, ultimately, died of full cardiac arrest due to opiate withdrawal syndrome and the effects thereof,

including, but not limited to, brain hemorrhage.

66.   As a direct and proximate result of Defendant DeAngelo's inadequate training and supervision of the corrections officers at the Woodland Correctional Facility and her implicit authorization, approval, and/or knowing acquiescence in the inferior and substandard treatment of inmates who were at serious risk of harm and/or had serious medical needs, the Estate of Tyler Venema, Deceased, has sustained and is entitled to compensation for conscious pain and suffering of the Deceased, funeral, burial, and economic costs and/or damages, loss of support, loss of gifts and gratuities and loss of love, society and companionship.

**WHEREFORE**, Plaintiff requests the following relief:

    a.    Reasonable medical, hospital, funeral and burial expenses;

    b.    Conscious pain and suffering;

    c.    Loss of financial support;

    d.    Loss of service;

    e.    Loss of gifts or other valuable gratuities;

    f.    Loss of comfort, society and companionship;

    g.    Compensatory damages;

h.     Reasonable attorney fees, costs and interest; and

i.     Such other and further relief as appears reasonable and just under the circumstances and otherwise recoverable under 42 U.S.C. § 1983 and 1988.

Respectfully submitted,

*/s/Heather A. Glazer*
HEATHER A. GLAZER (P-54952)
ROBERT M. GIROUX (P-47966)
Attorneys for Plaintiffs
28588 Northwestern Hwy, Suite 100
Southfield, MI 48034
(248) 531-8665

Dated:  September 24, 2021      hglazer@greatMIattorneys.com
rgiroux@greatMIattorneys.com

## JURY DEMAND

Plaintiff, Janelle Grates, as Personal Representative of the Estate of Tyler Venema, deceased, hereby demands a trial by jury in this matter.

Respectfully submitted,

*/s/Heather A. Glazer*
HEATHER A. GLAZER (P-54952)
ROBERT M. GIROUX (P-47966)
Attorneys for Plaintiffs
28588 Northwestern Hwy, Suite 100
Southfield, MI 48034
(248) 531-8665

Dated:  September 24, 2021      hglazer@greatMIattorneys.com
rgiroux@greatMIattorneys.com

- 18 -